# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

MONTEZ MOORE,

        Petitioner,

v.                             Case No. 04-CV-71210-DT

KEN McKEE,

        Respondent.

_____/

## OPINION AND ORDER DENYING HABEAS CORPUS PETITION

Petitioner Montez Moore has applied for the writ of habeas corpus under 28 U.S.C. § 2254. The habeas petition attacks Petitioner's state convictions for first-degree murder and related crimes. The court has concluded for reasons given below that the habeas petition must be denied.

## I. BACKGROUND

Petitioner was tried in Wayne County, Michigan with his two co-defendants, Thomas Culbreath and D'Andre Coffee.[1] On July 9, 1999, a circuit court jury found all three defendants guilty of: first-degree murder, Mich. Comp. Laws § 750.316; assault with intent to commit murder, Mich. Comp. Laws § 750.83; armed robbery, Mich. Comp. Laws §750.529; extortion, Mich. Comp. Laws §750.213; kidnapping, Mich. Comp. Laws §750.349; and possession of a firearm during the commission of a felony, Mich. Comp. Laws § 750.227b.

---

[1] A fourth defendant, James Langford, was tried separately.

The convictions arose from the kidnapping of Athena Akins and her son, Leroy Akins, and a subsequent shooting during which one police officer was killed and three other police officers were injured.  The evidence adduced at trial indicated that, on December 5, 1998, several men abducted Athena and Leroy Akins from the driveway of their house using their van. Then they robbed the victims and attempted to extort money from Eric Anthony, who was Athena's boyfriend and Leroy's father.  Eric Anthony ultimately responded to the men's threatening telephone calls by placing a bag of money in the middle of a street designated by the kidnappers.  The kidnappers picked up the money and shortly thereafter released Athena and Leroy Akins.

Meanwhile, Eric Anthony had contacted the police.  Police officers Jeffrey Bonner and Shawn Bandy observed the van and followed it in a marked car.  Officers Lloyd Todd, David Pomeroy, and Ramon Childs followed the van in an unmarked car.  Shawn Bandy was killed when the van slowed down and someone fired nineteen shots out the back window of the van.  Jeffrey Bonner, Lloyd Todd, and Ramon Childs were injured by the gunfire.

The officers were unable to see the occupants of the van, and neither Athena nor Leroy Akins was able to identify any of the defendants at trial because the kidnappers had worn masks.  Eugene Childrey, however, testified that James Langford drove the van and that he (Childrey), Petitioner, Thomas Culbreath, and D'Andre Coffee were passengers in the van.[2]  Childrey described how the men had kidnapped Athena and Leroy Akins and robbed them.  He claimed that the occupants of the van saw the police

---

[2] Childrey pleaded guilty to armed robbery and kidnapping for his role in the incident.  He testified for the prosecution in return for a sentence of five to fifteen years.

2

within minutes of releasing the victims and argued about who would fire at the pursuing police officers. D'Andre Coffee said, "Bang at 'em," and Thomas Culbreath said, "Naw, you shoot them." When James Langford instructed Petitioner to do it, Petitioner went to the back of the van and started shooting out the back window.

Petitioner's nephew, Antonio Barnett, testified for the prosecution in return for not being prosecuted as an accessory after the fact. He testified that James Langford informed him on the day after the shooting that Petitioner had gone to the back of the van and fired a gun. The police arrested Thomas Culbreath, D'Andre Coffee, and Eugene Childrey within a few days of the incident. After the police learned that Petitioner and James Langford had gone to Erie, Pennsylvania, they blockaded the house where they suspected Petitioner and Langford were staying. Petitioner and Langford surrendered about eight hours later.

The prosecutor's theory was that Petitioner fired at the police and that the defendants acted together, aiding and abetting each other, in committing all the crimes. The defendants did not testify. They argued through counsel that they were not involved in the crimes, that it was a case of mistaken identity, and that Eugene Childrey's testimony was not credible.

The trial court sentenced Petitioner to life imprisonment for the murder, thirty to sixty years in prison for the assaults on the police officers, and two years in prison for the felony firearm. The robbery, extortion, and kidnapping charges were merged with the felony murder conviction at sentencing.

3

Petitioner raised his first six habeas claims in an appeal of right. The Michigan Court of Appeals affirmed his convictions in an unpublished opinion. *See People v. Moore*, No. 224084, 2002 WL 869961 (Mich. Ct. App. Apr. 30, 2002). Petitioner raised the same six claims in an application for leave to appeal in the Michigan Supreme Court. On December 30, 2002, the state supreme court denied leave to appeal because it was not persuaded that the questions presented should be reviewed.[3] *See People v. Moore,* 467 Mich. 933; 655 N.W.2d 565 (2002) (table).

Petitioner signed and dated his habeas corpus petition on March 22, 2004. His grounds for relief read:

> I.   Defendant-appellant's convictions should be reversed because the trial court failed to grant the motion for separate juries.
>
> II.  Defendant-appellant's convictions should be reversed because the closing argument of a co-defense counsel denigrated the co-defendants. As such, the motion for mistrial should have been granted.
>
> III. Defendant-appellant['s] convictions should be reversed because the closing argument[s] of the prosecutor were improper and the trial court erred in denying the motion for mistrial on this basis.
>
> IV.  Defendant-appellant['s] convictions should be reversed because the trial court abused its discretion in admission of a statement of a prior co-defendant.

---

[3]Petitioner had ninety days from December 30, 2002 to file a petition for a writ of certiorari to the United States Supreme Court. *See* Sup. Ct. R. 13. Although Petitioner did not file a petition for a writ of certiorari, his one-year statute of limitations for filing a federal habeas petition did not begin to run until the expiration of the ninety-day period, or until March 30, 2003. *See Bronaugh v. Ohio,* 235 F.3d 280, 283 (6th. Cir. 2000). His instant habeas, filed less than a year later, on March 22, 2004, is therefore timely. 28 U.S.C. § 2244(d)(1)(A).

4

V.    Defendant-appellant's convictions should be reversed
because the trial court erred in failing to give instructions as
requested by the defense.

VI.   Defendant-appellant's convictions should be reversed
because the trial court abused its discretion in admission of
seized weapons where there was no indication the weapons
were used in the offense.

VII.  Defendant-appellant's convictions should be reversed
because the . . . prosecutor failed to use due diligence to
produce a res gestae witness.  This deprived defendant of
his due-process rights and right to a fair trial.

Because Petitioner did not raise his seventh habeas claim in state court, the

court gave him the option of deleting his seventh claim or of returning to state court to

further exhaust state remedies.  Petitioner responded to the court's order by indicating

that he wanted to delete his unexhausted seventh claim.  The court will address

Petitioner's first six claims in light of the following standard of review.

## II.  STANDARD OF REVIEW

Petitioner is entitled to the writ of habeas corpus only if he can show that the

state court's adjudication of his claims on the merits–

(1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the State
court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state

court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

question of law or if the state court decides a case differently than [the Supreme] Court

5

has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362,

412-13 (2000). A state court's decision is an "unreasonable application of" clearly

established federal law "if the state court identifies the correct governing legal principle

from [the Supreme] Court's decisions but unreasonably applies that principle to the facts

of the prisoner's case." *Id.* at 413. "Avoiding these pitfalls does not require citation of

[Supreme Court] cases – indeed, it does not even require *awareness* of [Supreme

Court] cases, so long as neither the reasoning nor the result of the state-court decision

contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam* opinion) (emphasis

in original).

> Furthermore, state findings of fact are presumed to be correct unless the defendant can rebut the presumption by clear and convincing evidence. 28 U.S.C. §  2254(e)(1). Finally, review is conducted in light of the law as it existed at the time of the final state court decision, *Teague v. Lane,* 489 U.S. 288 (1989), unless an intervening constitutional decision announces a "watershed" rule of criminal law with implications for the fundamental fairness of the trial proceeding. *Caspari v. Bohlen,* 510 U.S. 383, 396 (1994).

*Baze v. Parker*, 371 F.3d 310, 318 (6th Cir. 2004), *cert. denied*, __ U.S. __, 125 S. Ct.

1670 (2005).

## III.  DISCUSSION

### A.  Severance

The first habeas claim alleges that the trial court should have granted Petitioner's

motion for a separate jury. Petitioner contends that he wanted to present a defense of

mere presence and duress, which would have been antagonistic to the defenses of his

co-defendants. In addition, Petitioner alleges that co-defendant D'Andre Coffee blamed

him (Petitioner) and Thomas Culbreath for the crimes.

6

Petitioner also claims that the jurors were overwhelmed with the amount of evidence presented at trial and the notoriety of the case.  He asserts that the trial court's constant instructions about which evidence to consider unfairly impacted his case. According to Petitioner, the lack of bifurcated juries prevented the jury from making a reliable judgment concerning his guilt or innocence.  The Michigan Court of Appeals concluded that the trial court properly denied Petitioner's motion for separate juries.

The United States Court of Appeals for the Sixth Circuit has explained that

> [a] defendant is not entitled to severance merely because he might have had a better chance of acquittal in a separate trial.  *See Zafiro v. United States,* 506 U.S. 534, 540 (1993).  Nor does he have a right to a separate trial merely because defendants present antagonistic defenses.  *See United States v. Day,* 789 F.2d 1217, 1224 (6th Cir.1986) (holding that absent some indication that the alleged antagonistic defendants misled or confused the jury, the mere fact that co-defendants blame each other does not compel severance).  Courts should grant a severance "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  *Zafiro,* 506 U.S. at 539.  Granting or denying severance is within the trial judge's discretion.  *See Glinsey v. Parker,* 491 F.2d 337, 343 (6th Cir. 1974).  And, a state trial court's alleged abuse of discretion, without more, is not a constitutional violation. *See Sinistaj v. Burt,* 66 F.3d 804, 805, 808 (6th Cir.1995).
>
> A petitioner seeking habeas relief on the basis of a trial court's failure to sever his trial from his co-defendant's bears a very heavy burden.  *See United States v. Horton,* 847 F.2d 313, 316 (6th Cir.1988).  As a general rule, joint trials are favored.  *See United States v. Dempsey,* 733 F.2d 392, 398 (6th Cir.1984).  Jurors are presumed to follow the instructions of the court and to give each defendant's case separate consideration.  *See Francis v. Franklin,* 471 U.S. 307, 324 n. 9 (1985).  The mere potential for confusion, standing alone, will not outweigh society's interest in the speedy and efficient resolution of criminal trials.  *See United States v. Moore,* 917 F.2d 215, 222 (6th Cir.1990).

*Stanford v. Parker*, 266 F.3d 442, 458-59 (6th Cir. 2001).

Petitioner "must show both (1) an abuse of discretion on the part of the trial court and (2) compelling and specific prejudice in order to successfully challenge the joinder of his trial with that of [his co-defendants]."  *Clark v. O'Dea*, 257 F.3d 498, 504 (6th Cir. 2001) (citing *Jenkins v. Bordenkircher*, 611 F.2d 162, 168 (6th Cir. 1979)).  He has failed to meet this standard in the following ways.

First, Petitioner and his co-defendants did not present mutually antagonistic defenses. They maintained essentially the same defense -- that they were not involved in the crimes, that it was a case of mistaken identity, and that the key prosecution witnesses, particularly Eugene Childrey, were not credible because they had a motive for testifying as they did.  Petitioner also argued that, at most, he was guilty of being an accessory after the fact.

Petitioner claims that, had he been tried alone, he could have asserted the defenses of duress and mere presence.  The joint trial, however, did not prevent Petitioner from asserting a duress defense.  One of his co-defendants requested a jury instruction on the defense.  The trial court declined to give the instruction because it did not think the evidence supported the defense.  *See infra* section III.E.1.b.  Petitioner also could have asserted a defense of mere presence.  D'Andre Coffee's attorney argued mere presence in her closing argument.  (Tr. July 2, 1999, at 69.)

Second, the trial court instructed the jurors that they should consider each defendant separately and not conclude that the defendants had associated with each other or were guilty simply because they were on trial together.  "[J]uries are capable of considering evidence for one purpose but not another."  *Washington v. Hofbauer*, 228 F.3d 689, 705 (6th Cir. 2000) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)).

8

The trial court's instructions to consider evidence against some defendants, but not other defendants, were not so confusing or frequent as to make it difficult to render a fair verdict.

Finally, D'Andre Coffee's closing argument did not blame Petitioner. Although Coffee argued that his guilt or innocence should be determined without regard to the other defendants, he speculated that the occupants of the van could have been somebody other than the defendants, such as James Langford, Eugene Childrey, Darryl Bogen, Jamal Randall, and an unidentified fifth person.

The court concludes that there was no compelling and specific prejudice to Petitioner's defense as a result of the joint trial and jury. Therefore, the trial court did not abuse its discretion in refusing to grant separate juries, and the state appellate court's decision was not contrary to, or an unreasonable application of, any Supreme Court case.

### B. Co-Counsel's Closing Argument

The second habeas claim alleges that co-defendant D'Andre Coffee's attorney denigrated the other defendants, including Petitioner, during closing arguments. According to Petitioner, counsel for Coffee appealed to the jurors' emotions and attempted to extricate Coffee from the charges. Coffee's attorney also stated that Police Officer Bonner wanted the person who committed the crimes "to fry." (Tr. July 2, 1999, at 62.) Petitioner argues that the jury was left with "no choice" but to find the other defendants responsible for the crimes. Petitioner moved for a mistrial on this basis, but the trial court denied his motion. The Michigan Court of Appeals found no impropriety in co-counsel's argument.

9

Petitioner has not cited any federal decisions, let alone Supreme Court decisions, in support of his claim about his co-defendant's closing argument. Prosecutors and defense attorneys may not make "unfounded and inflammatory attacks on the opposing advocate," *United States v. Young*, 470 U.S. 1, 9 (1985), but the court has found no Supreme Court case analyzing the impact of a defense attorney's closing argument on a co-defendant.

Furthermore, as the state court of appeals recognized, D'Andre Coffee's attorney did not mention Petitioner, nor claim that Petitioner was the shooter or guilty of the charges. The attorney's criticism of Athena Akins's attitude on cross-examination was an attempt to discredit her, and the comments about Leroy Akins's failure to console his mother during the kidnapping did not denigrate Petitioner or his attorney.

In addition, "the arguments of counsel are simply not evidence," *United States v. Sandin*, 888 F.2d 300, 311 (3d Cir. 1989), and the trial court informed the jurors that the attorneys' statements and arguments were not evidence. The trial court also charged the jurors not to let sympathy or prejudice influence their decision, but to decide the case on the evidence and to consider each defendant separately.

Even if co-counsel's argument amounted to a constitutional violation, the evidence against Petitioner was substantial and not ambiguous. The alleged error could not have had a "substantial and injurious effect or influence in determining the jury's verdict" and was harmless. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Petitioner is not entitled to the writ of habeas corpus on the basis of his second claim.

## C. The Prosecutor's Closing Argument

10

Petitioner next alleges that the prosecutor's closing argument was improper. Petitioner claims that the prosecutor shifted the burden of proof, appealed to the jurors' emotions, misstated the facts, denigrated Petitioner's defense, and injected his personal opinion into the argument. Petitioner maintains that the only remedy for the combination of errors was a mistrial.

The trial court stated in response to Petitioner's motion for a mistrial that the prosecutor's statements were a fair comment on the evidence and on the defense attorneys' closing arguments. The trial court ruled that, although the prosecutor was "at times overzealous," (7/6/99 Tr. at 16), there was no error requiring a mistrial. The Michigan Court of Appeals reviewed Petitioner's claim on the merits and concluded that none of the challenged remarks amounted to prosecutorial misconduct.

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)), *cert.* denied, __ U.S. __, 125 S. Ct. 1645 (2005). To prevail on a claim of prosecutorial misconduct, Petitioner must demonstrate that the prosecutor's remarks, taken in the context of the entire trial, were sufficiently prejudicial and infected the trial with such unfairness as to make the resulting conviction a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 639, 643 (1974). It is not enough to show that the prosecutor's conduct was improper or even universally condemned. *Bowling*, 344 F.3d at 512. The Court can grant relief only if the comments were "so flagrant as to render the entire trial fundamentally unfair." *Id.*

When reviewing claims of prosecutorial misconduct, the first question to consider is whether the prosecutor's statements were improper. *Macias v. Makowski*, 291 F.3d

11

447, 452 (6th Cir. 2002).  If the remarks were improper, the court must consider whether

the impropriety was so flagrant as to violate the defendant's right to due process.  *Id*.

The four factors for determining flagrancy are:

> (1) whether the remarks tended to mislead the jury or to prejudice the
> accused; (2) whether they were isolated or extensive; (3) whether they
> were deliberately or accidentally placed before the jury; and (4) the
> strength of the evidence against the accused.

*United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994).

"A prosecutor is permitted a certain degree of latitude in summation," *United*

*States v. Barker*, 553 F.2d 1013, 1025 (6th Cir. 1977), and is not "required to present . . .

closing arguments that are devoid of all passion."  *Williams v. Chrans*, 945 F.2d 926, 947

(7th Cir. 1991).  Moreover, the Sixth Circuit "has been reluctant to grant habeas petitions

based on improper prosecutorial statements at closing argument."  *Wilson v. Mitchell*,

250 F.3d 388, 399 (6th Cir. 2001).  When, as here, the challenged remarks  occurred

during the rebuttal argument, prosecutors ordinarily are "entitled to wide latitude;" they

"may fairly respond to arguments made by defense counsel."  *Angel v. Overberg*, 682

F.2d 605, 607-08 (6th Cir. 1982) (*en banc*) (citing *Donnelly v. DeChristoforo*, 416 U.S.

637 (1974)).

### 1.  Shifting the Burden of Proof

Petitioner contends that the prosecutor improperly shifted the burden of proof to

him when he stated that Eugene Childrey's agreement with the police must have been

valid because the defense attorneys did not question a police inspector about the

agreement.  The actual comment reads:

> [The prosecutor]:  Then Mr. Cripps [defense counsel for co-defendant
> Thomas Culbreath] talked about this great deal with Inspector Rice on

12

December the 9th.  When we brought in Inspector Rice, he didn't ask him
about did you make any deal . . . .

(Tr. July 2, 1999, at 124.)  According to Petitioner, these remarks surreptitiously vouched

for Eugene Childrey and suggested that Petitioner was required to question Inspector

Rice and prove or disprove the validity of the agreement with Childrey.

Prosecutors may not inject themselves by vouching for the credibility of their

witnesses.  *Caldwell v. Russell*, 181 F.3d 731, 737 (6th Cir. 1999), *abrogated on other

grounds as explained in Mackey v. Dutton*, 217 F.3d 399, 406 (6th Cir. 2000)).  Nor may

they suggest that the defendant carries the burden of proof or any obligation to produce

evidence to prove his innocence.  *United States v. Clark*, 982 F.2d 965, 968-69 (6th Cir.

1993).

The challenged remarks did not vouch for Eugene Childrey's credibility, and they

did not insinuate that defense counsel was required to prove or disprove the validity of

the agreement between Childrey and the police.  Although the remark suggested that Mr.

Cripps could have questioned Inspector Rice, "a comment by the prosecutor on the

failure by defense counsel, as opposed to the defendant, to counter or explain evidence

does not violate a defendant's Fifth Amendment right not to testify."  *United States v.

Hernandez*, 145 F.3d 1433, 1439 (11th Cir. 1998).

The remark did not prejudice Petitioner in any event, because it was directed at

attorney Cripps, who represented Thomas Culbreath.  Furthermore, the comment was a

fleeting remark in a lengthy trial, and the defense attorneys thoroughly cross-examined

Childrey about his statements to the police, his plea agreement, and his motive for

testifying.  Even if the remark were ill-advised, it was not so flagrant that it requires a new

13

trial. *Cf. Greer v. Mitchell*, 264 F.3d 663, 683 (6th Cir. 2001) (concluding that the prosecutor's remark concerning the petitioner's lack of an expert witness to refute the coroner's testimony may have been ill-advised, but it was not so flagrant as to the require reversal).

### 2.  Appeal to the Jurors' Sympathies

Petitioner contends that the prosecutor made inappropriate appeals to the jurors' sympathies when he said that one of the victims was a mother and that the deceased police officer would never see another minute of time.  The prosecutor also pleaded for justice and, according to Petitioner, referred to the defendants as killers.  Petitioner contends that the prosecutor appealed to the jurors' civic duties by linking the color green to money, the color blue to uniforms, and the color red to spilt blood.[4]

Prosecutors may not "incite the passions and prejudices of the jury by appealing to the national or community interests of jurors." *United States v. Emuegbunam*, 268 F.3d 377, 404 (6th Cir. 2001).  This did not occur here.  Linking certain colors to the evidence was not an inappropriate appeal to the jurors' civic duties.  Nor was the plea for justice.  The prosecutor asked for justice in the context of the evidence adduced at trial. (Tr. July 2, 1999, at 148.)

The comments on Athena Akins's status as a mother and her reasons for reacting as she did were a direct response to a co-defendant's cross-examination and closing argument about Athena.  (*Cf.* Tr. June 23, 1999, at 82-83 and Tr. July 2, 1999, at 56-57 and 61 with Tr. July 2, 1999, at 133-34.)  The comment about Shawn Bandy never

---

[4]  The cited page for this comment is missing from the court's copy of the transcript, but the comment is quoted in the state court's opinion.

having another minute of time was a fleeting remark, which the prosecutor made to show that the case was important and worthy of the jurors' attention before the Fourth of July weekend. (Tr. at 118-19.) The prosecutor's mention of "the killers" (*Id.* at 128) may be troublesome if the prosecutor had called Petitioner a killer. He did not, and he was entitled "to argue that the jury should arrive at a particular conclusion based upon the record evidence, including the conclusion that the evidence prove[d] the defendant[s'] guilt." *Caldwell*, 181 F.3d at 737.

### 3. Statement of Facts

Petitioner alleges that the prosecutor misstated the facts when he said that co-defendant Thomas Culbreath went to Erie, Pennsylvania. (Tr. July 2, 1999, at 129.) The testimony at trial established that Petitioner and James Langford, not Culbreath, went to Erie, Pennsylvania after December 5, 1998.

A prosecutor may not misrepresent facts in evidence, *Washington v. Hofbauer*, 228 F.3d 689, 700 (6th Cir. 2000), nor "bring to the attention of the jury any 'purported facts that are not in evidence and are prejudicial.'" *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000) (quoting *United States v. Wiedyk*, 71 F.3d 602, 610 (6th Cir. 1995)). The misstatement here most likely was a slip of the tongue, not an intentional misstatement of the facts. It did not prejudice Petitioner because it was not made about him and the trial court immediately instructed the jurors to disregard the comment.[5]

---

[5] In addition, if the transcript is read literally, the prosecutor corrected himself by stating that "Tommy Culbreath wasn't in Erie." The relevant portion of the transcript reads:

MR. SIMOWSKI [The prosecutor]: They [the defendants] want a fall guy, and because Athena Akins and Eric Anthony, okay, Eric Anthony

### 4.  Disparaging the Defense

Petitioner alleges that the prosecutor:  (1) disparaged the defense by attacking

each defense attorney and by stating that the defense arguments were not necessarily

fair and square; (2) denigrated the defense by questioning the cross-examination of

Athena Akins and stating that the defense attorneys were playing games with the jury

and were not being fair and square; and (3) implied that the defense attorneys were not

being truthful because they used alternate defense theories.  Prosecutors may not make

"unfounded and inflammatory attacks on the opposing advocate," *Young*, 470 U.S. at 9,

or "personal attacks on opposing counsel."  *United States v. Collins*, 78 F.3d 1021, 1040

(6th Cir. 1996).   However, "[a] prosecutor commenting that the defense is attempting to

trick the jury is a permissible means of arguing so long as those comments are not overly

---

thinking it was Bogen and Randall, and they were named to the police. They go hey, that's our chance, let's blame it on those guys, but they weren't at breakfast, at Saratoga, at Roxbury, at Eastland, or they weren't in Erie Pennsylvania either.  *But Tommy Culbreath and Montez Moore were* --

MR. CRIPPS:   That's a mis-statement, Judge.

MR. SIMOWSKI:  *Tommy Culbreath wasn't in Erie.*

MR. CRIPPS:  That's a total mis-statement of the evidence.

THE COURT:   All right, okay.

MR. CRIPPS:  He's going to[o] far.

THE COURT:  He re -- disregard that.  You are to consider the evidence. Continue, Mr. Simowski.

(Tr. July 2, 1999, at 129) (emphasis added.)  The court believes from the context of the disputed comment that the transcriber may have incorrectly attributed the comment, "Tommy Culbreath wasn't in Erie," to the prosecutor.

excessive or do not impair the search for the truth." *United States v. August*, 984 F.2d 705, 715 (6th Cir. 1992).

The disputed comments here were not unfounded or inflammatory. They were a direct response to the defense attorneys' closing arguments, as opposed to a personal attack on defense counsel or the defendants. As the state court recognized, the prosecutor was suggesting a different interpretation of the evidence. The prosecutor pointed out that the defense attorneys were being selective about the facts they emphasized, finding witnesses credible when it helped their cases and incredible when it hurt their cases. The prosecutor urged the jurors to look at all the evidence. (Tr. July 2, 1999, at 134.) The comments were not improper when viewed in context.

### 5. Personal Opinion

Petitioner maintains that the prosecutor interjected his personal opinion into his closing argument. A prosecutor may not "express a personal opinion or belief regarding the truth or falsity of any testimony or evidence," *United States v. Hurst*, 951 F.2d 1490, 1502 (6th Cir. 1991), nor "unduly inject himself or herself into the proceedings." *United States v. Gholston*, 10 F.3d 384, 389 (6th Cir. 1993).

The complained of comment here was the prosecutor's statement that he resented the suggestion that police officers had forced witnesses to say things. This comment was not improper because it did not express a personal opinion or belief on the truth or falsity of any evidence. The prosecutor was reacting to the defense attorneys' insinuation that Eugene Childrey was a tool of the police and that the police were corrupt. The prosecutor pointed out that the police could have stopped investigating the

case when witnesses implicated two men other than the defendants. (Tr. July 2, 1999, at 130-32.) This argument was based on the evidence.

Petitioner also objects to the comment that the defense attorneys were not being forthright. The prosecutor suggested that Mr. Cripps, who represented Thomas Culbreath, was not being forthright because Cripps said that Kelli Crockett did not see Thomas Culbreath at Eastland Apartments. The prosecutor pointed out that, although Crockett might not have seen Culbreath there, another witness did see him there. (Tr. July 2, 1999, at 132.) This argument was not directed at Petitioner's attorney, and even though the prosecutor rhetorically asked, "[W]hose (sic) being forthright?" the prosecutor based his argument on the evidence. The prosecutor did not express a personal opinion on Petitioner's guilt or innocence.

### 6. Summary

The Court agrees with the state court that the prosecutor's comments were not improper. Even if the comments were improper, they did not amount to flagrant misconduct, because they were not misleading, prejudicial, or extensive. Moreover, the evidence against Petitioner was substantial and one-sided. The disputed remarks likely had no "bearing on the outcome of the trial in light of the strength of the competent proof of guilt." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997). This is not a case in which the prosecutor's "statements to the jury could have tipped the scales in favor of the prosecution." *Robison v. Maynard*, 829 F.2d 1501, 1509 (10th Cir. 1987). Therefore, the state court's conclusion that none of the challenged remarks amounted to prosecutorial misconduct was not an unreasonable application of clearly established Supreme Court precedent.

18

### D.  Admission of an Accomplice's Statement

The fourth habeas claim alleges that the trial court abused its discretion when it admitted a prior co-defendant's statement in evidence.  Petitioner has not clearly identified the statement in dispute.  The court believes that he is referring to James Langford's out-of-court statement to Antonio Barnett that a gun was passed around inside the van and that Petitioner went to the back of the van and fired the gun out the back window.  (Tr. Jun 24, 1999, at 17, 19-20.)  This statement was not reliable, according to Petitioner, and did not fall within a firmly rooted exception to the hearsay rule.

The prosecutor moved to admit the out-of-court statement as a statement against penal and criminal interest.  The trial court granted the prosecutor's request.  The court stated that Langford was unavailable because he was charged with the crimes, and he could not be compelled to testify if he chose not to testify.  The trial court determined that Langford's statement bore particularized guarantees of trustworthiness because:  (1) the statement placed Langford in a position to see what was going on, it was made to a friend the day after the event, and it was unresponsive to Barnett's original question about the ransom; (2) the environment was not coercive, but friendly, and in a place of safety; (3) Langford did not minimize the role he played in the offense or exculpate himself from liability; (4) Langford had no reason to lie; and (5) there was independent evidence corroborating the statement.  (Tr. Apr. 19, 1999, at 31-41.)  The Michigan Court of Appeals concluded from the totality of the circumstances that the trial court did not abuse its discretion in admitting Langford's statements to Barnett.

19

Petitioner's allegation that the trial court violated Michigan's rules of evidence is not a basis for granting the writ of habeas corpus. "[F]ederal habeas corpus relief does not lie for errors of state law," *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990), and "errors in the application of state law, especially rulings regarding the admission or exclusion of evidence, are usually not to be questioned in a federal habeas corpus proceeding." *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2241; *Rose v. Hodges*, 423 U.S. 19, 21 (1975) (per curiam )." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).

Petitioner's claim has no merit even if the court were to construe it as a constitutional claim. The Sixth Amendment right to confront witnesses provides a criminal defendant with "the right physically to face those who testify against him, and the right to conduct cross-examination." *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987). At the time of Petitioner's trial, the admissibility of out-of-court statements under the Confrontation Clause was governed by *Ohio v. Roberts*, 448 U.S. 56 (1980). The Supreme Court stated in *Roberts* that,

> when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the
>
> evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

20

*Id.* at 66.[6]

An accomplice's confession which inculpates a criminal defendant does not fall within a firmly rooted exception to the hearsay rule. *Lilly v. Virginia*, 527 U.S. 116, 134 (1999). This conclusion does not mean "that the Confrontation Clause imposes a 'blanket ban on the government's use of [nontestifying] accomplice statements that incriminate defendant.' Rather, it simply means that the Government must satisfy the second prong of the *Ohio v. Roberts*, 448 U.S. 56 (1980) test in order to introduce such statements." *Id.* at 134 n.5.

The declarant here was James Langford, who was unavailable because he had been charged with the same crimes. His case was severed from his co-defendants, but he had not yet been tried. It is unlikely that he would have agreed to testify at Petitioner's trial. Instead, he most certainly would have invoked his Fifth Amendment right to remain silent.

---

[6] *Roberts* was abrogated in part by *Crawford v. Washington*, 541 U.S. 36 (2004), in which the Supreme Court held that, when testimonial statements are at issue, the Sixth Amendment demands a showing of unavailability and a prior opportunity for cross-examination before the statements may be admitted in evidence. *Id.* at 68. When nontestimonial evidence is at issue, the Supreme Court stated that "it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law--as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." *Id.*

*Crawford* is inapplicable here because it was not clearly established law at the time of Petitioner's trial or subsequent appeal, and "newly promulgated rules of criminal procedure do not apply retroactively to cases on collateral review." *Dorchy v. Jones*, 398 F.3d 783, 788 (6th Cir. 2005) (citing *Teague*, 489 U.S. at 305-11). *Crawford* is inapplicable for an additional reason: James Langford's comments were nontestimonial, and *Roberts* remains the controlling Supreme Court precedent for nontestimonial statements. *United States v. Franklin*, 415 F.3d 537, 546 (6th Cir. 2005).

Langford's statement bore particularized guarantees of trustworthiness in that it was made freely and voluntarily to Antonio Barnett, who was his friend and Petitioner's nephew.  Langford could not have suspected that Barnett would cooperate with the police.  Consequently, Langford had no motive to lie or exculpate himself when he made his incriminating and accusatory statements to Barnett.

Furthermore, "[b]y his own statements, Langford placed himself inside the van and in a position to see that a weapon was passed around and that Moore went to the back of the van and started shooting. . . ."  *Moore*, 2002 WL 869961, at *7.  Although Barnett claimed that Langford had been drinking and was "high" when he spoke to him,

> Langford made the statements at issue soon after the incident.  Also, Barnett's question to Langford asked about the van; there is no indication that Barnett asked Langford about the shooting.  The statements were made in a non-custodial environment and the substance of the statements did not minimize Langford's role in the incident.  Nor is there any suggestion that Langford would have had a motive to lie to Barnett in that situation.  It is a fair inference that in that situation Langford would likely speak truthfully about the matter to Barnett.

*Id.* (citations omitted).

Because Langford was unavailable and his statements carried particularized guarantees of trustworthiness, the trial court did not violate Petitioner's constitutional right of confrontation when it admitted the statements.  The state appellate court's conclusion that the trial court did not abuse its discretion was not contrary to, or an unreasonable application of, *Roberts.*

Even if Petitioner's constitutional right to confront witnesses was violated, the court does not have a "grave doubt" concerning whether the error was harmless.  *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995).  Eugene Childrey testified that Petitioner fired at

22

the police.  Thus, James Langford's alleged comment to Barnett could not have had a "substantial and injurious effect or influence" on the jury's verdict and was harmless. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

### E.  The Jury Instructions

The fifth habeas claim challenges the trial court's jury instructions.  Petitioner alleges that the trial court failed to instruct the jury on two of his defenses and on certain lesser included offenses.

The question on habeas corpus review of jury instructions is whether a defendant's federal constitutional rights were violated by the instructions.  *Roe v. Baker*, 316 F.3d 557, 564 (6th Cir. 2002).  The fact that the jury instructions may have been incorrect under state law is not a basis for habeas relief.  *McGuire*, 502 U.S. at 71-72. The petitioner must show that the instructions "so infected the entire trial that the resulting conviction violates due process."  *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). Errors in jury instructions do not rise to the level of a constitutional violation unless the habeas petitioner can make that showing.  *Buell v. Mitchell*, 274 F.3d 337, 365 (6th Cir. 2001).  Moreover, the Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly.  *Byrd*, 209 F.3d at 527 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

### 1.  Petitioner's Defenses

A defendant generally "is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."

23

*Mathews v. United States*, 485 U.S. 58, 63 (1988) (citing *Stevenson v. United States*, 162 U.S. 313 (1896)). *Mathews* is not controlling, however, if there is no basis on which to overcome the state court's factual findings that there was not sufficient evidence to support the defendant's theory. *Mitzel v. Tate*, 267 F.3d 524, 537 (6th Cir. 2001).

### a. Claim of Right

Petitioner wanted to assert a claim-of-right defense to the armed robbery charge. He argued that the defendants thought they were agents for two men who were owed money by Eric Anthony. Thus, according to Petitioner, the defendants believed they had a claim of right to the money they took from Athena Akins, who was Eric Anthony's girlfriend.

If a defendant in good faith believes that the money which he demanded was his money and that he was entitled to it, he is not guilty of robbery because there is no felonious intent under those circumstances. *People v. Henry,* 202 Mich. 450, 455; 168 NW 534, 536 (1918) (quoting *People v. Walker,* 38 Mich. 156 (1878)). The trial court concluded that there was no evidence of an agency relationship or an honest belief that the stolen money belonged to the defendants. (Tr. July 1, 1999, at 56-62.) Petitioner asserts that the trial court substituted its determination of the facts for the jurors' findings of fact when it made this conclusion. However, he has not pointed to any evidence from which the jury could have concluded that the defendants were collecting money for someone else. Although the defendants tried to show that Eric Anthony was indebted to Jamal Randall and Darryl Bogen, there was no evidence of an agency relationship between those men and the defendants. Nor was there any evidence that the defendants actually believed the money belonged to them. Furthermore, a claim-of-right

24

defense would have been inconsistent with the defendants' claim that they were not the men in the van.

## b. Duress

Petitioner contends that the trial court foreclosed him from raising a viable defense of duress. The Michigan Court of Appeals explained duress and its elements as follows:

> (1) The threatening conduct was sufficient to create in the mind of a reasonable person the fear of death or serious bodily harm;
>
> (2) The conduct in fact caused such fear of death or serious bodily harm in the mind of the defendant;
>
> (3) The fear or duress was operating upon the mind of the defendant at the time of the alleged act; and
>
> (4) The defendant committed the act to avoid the threatened harm.
>
> "A mere threat of future injury is insufficient to support a defense of duress."  "[T]he threatened danger must be present, imminent, and impending."  Duress is not a valid defense to homicide.  The defendant is required to produce some evidence on all of the elements of the defense of duress before he is entitled to a duress instruction.  "Unless a defendant submits sufficient evidence to warrant a finding of duress, the trial court is not required to instruct the jury on that defense."

*Moore*, 2002 WL 869961, at *8 (citations omitted).

The prosecutor presented evidence that, after the defendants abducted Athena and Leroy Akins, Thomas Culbreath took some money out of Athena's purse and told the driver of the van that the sum was $260.00.  Because Athena had told the driver that she was carrying $460.00, the driver allegedly threatened to kill Culbreath unless he turned over an additional $200.00.  (Tr. July 23, 1999, at 41-42.)

25

There was additional evidence that everyone in the van wanted to bail out shortly before the shooting and that Langford would not let anyone exit the van. Antonio Barnett concluded from Langford's account of the incident that, anyone who had tried to get out of the van would have been killed. (Tr. June 24, 1999, at 56-57, 60-62.)

The trial court denied the defendants' request for an instruction on duress because, in its opinion, there was no evidence that the defendants actually were afraid of death or serious bodily harm or that they acted to avoid threat or harm. The court noted that all the defendants were armed at the time. (Tr. July 1, 1999, at 65-66.)

The Michigan Court of Appeals agreed that the evidence did not support a duress defense. It stated that,

> [w]ith respect to the underlying felonies, there was no evidence that defendants acted under threats from Langford. As the trial court correctly observed, Langford's threat to kill the person who did not give him the full amount of money taken from Athena's purse was not evidence that the others participated in the underlying felonies due to duress. With respect to the shooting, duress is not a defense to homicide, and therefore Barnett's testimony that Langford told him that the others in the van wanted to be let out before the shooting is not germane. Further, Barnett clarified his testimony by explaining that his belief that Langford would have "flipped the script" was his interpretation of Langford's statements.

*Moore*, 2002 WL 869961, at *9. This court agrees with the Michigan Court of Appeals that the evidence did not support a duress defense.

## 2. Lesser-Included Offenses

Petitioner claims that the trial court should have instructed his jury on certain lesser-included offenses. The Supreme Court has declined to hold that due process requires the giving of jury instructions on lesser-included offenses in non-capital cases. *See Beck v. Alabama*, 447 U.S. 625, 638 n.14 (1980). The United States Court of

26

Appeals for the Sixth Circuit has interpreted *Beck* to mean that "the Constitution does not require a lesser-included offense instruction in non-capital cases." *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001) (citing *Bagby v. Sowders*, 894 F.2d 792, 795-97 (6th Cir. 1990) (*en banc*)).

Petitioner was charged with first-degree murder, which carries a mandatory penalty of life imprisonment without the possibility of parole. *People v. Morrin*, 31 Mich. App. 301, 325; 187 N.W.2d 434, 447 (1971). This penalty is the State's most severe, and at least one federal court of appeals has assumed, without actually deciding the issue, that "conviction of a crime punishable by the state's most severe penalty of life imprisonment without parole qualifies as a 'capital' conviction," at least for Sixth Amendment purposes. *See L'Abbe v. DiPaolo*, 311 F.3d 93, 97 n.3 (1st Cir. 2002). In 1997, the Sixth Circuit declined to decide whether it should treat a case as a noncapital case for post-conviction purposes when the death penalty was not imposed. *See Drake v. Superintendent, Trumbull Corr. Inst.*, 106 F.3d 400, 1997 WL 14422, at *9 (6th Cir. 1997) (unpublished opinion). In a more recent published decision, however, the Sixth Circuit applied *Beck* and *Bagby* to a first-degree murder case arising out of Michigan. *See Scott v. Elo*, 302 F.3d 598 (6th Cir. 2002). The Sixth Circuit stated that "failure to instruct on a lesser included offense in a noncapital case is not 'such a fundamental defect as inherently results in a miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure.'" *Id.* at 606 (quoting *Bagby*, 894 F.2d at 797). Consequently, in this Circuit, Petitioner's claim about the trial court's failure to instruct on lesser-included offenses arguably is not cognizable on habeas review.

27

The court concludes for the following reasons that Petitioner's claim would have no merit even if it were cognizable on habeas review.  "[A] Beck instruction is only required when 'there was evidence which, if believed, could reasonably have led to a verdict of guilt of a lesser offense,' but not the greater [offense]. . . .   A lesser-included offense instruction is therefore not required when the evidence does not support it. . . ."  *Campbell*, 260 F.3d at 541 (quoting *Hopper v. Evans*, 456 U.S. 605, 610 (1982)).

### a.  Intentional  Discharge of a Firearm Without Malice

Petitioner alleges that the trial court should have instructed the jury on intentional discharge of a firearm without malice, Mich. Comp. Laws § 750.233, as a lesser-included offense to murder.  At the time of Petitioner's trial, § 750.233 read:  "Any person who shall intentionally, without malice, point or aim any fire-arm at or toward any other person, shall be guilty of a misdemeanor."  Petitioner asserts that there was no evidence of a firing with malice (the intent to kill), which is an element of murder, and that the jury could have concluded he was trying to scare the police.

The defendants allegedly informed Athena Akins before releasing her that, if the police followed them, a shoot-out would occur, because they were not going to jail for her.  (Tr. June 23, 1999, at 57.)  There was additional evidence that, before the shooting, D'Andre Coffee said, "Bang at 'em," and when James Langford asked Thomas Culbreath to shoot at the police, Culbreath said, "Naw, you shoot them."  (Tr. June 21, 1999, at 73, 74-76.)  The shooter fired the gun nineteen times.  (Tr. June 29, 1999, at 25 and 65-66.)  This evidence was some indication that the defendants acted with malice and were not simply trying to scare the police.  Therefore, the jury could not reasonably have believed that the defendants were guilty of the lesser offense, but not the greater offense.

28

### b.  Careless, Reckless, or Negligent Discharge
### of a Firearm Causing Death or Injury

Petitioner next alleges that the trial court should have instructed the jury on

careless, reckless, or negligent discharge of a firearm, Mich. Comp. Laws § 752.861.  He

claims once again that the jury could have concluded he was trying to scare people, not

kill them.

"[T]he statutory offense of killing or injuring a person by careless, reckless, or

negligent discharge of a firearm [is] a cognate lesser included offense to murder," *People*

*v. Heflin,* 434 Mich. 482, 496 n 10; 456 N.W.2d 10, 16 n.10 (1990).  Nevertheless, the

evidence suggested that the gun was discharged intentionally:

> Childrey testified that Moore fired the rifle "numerous times" and the police
> found nineteen shell casings inside the van.  Moore shot out of the back of
> the van at the police vehicles pursuing the van.  Further, Langford had told
> Athena Akins that they would get into a shootout with the police if
> necessary, because they were not going to go to jail for her.  Also, Childrey
> testified that there was discussion inside the van regarding who would
> shoot.

*Moore*, 2002 WL 869961, at *9.  The evidence did not support a jury instruction on mere

careless, reckless, or negligent discharge of a firearm, and the jury could not reasonably

have believed that the defendants were guilty of the lesser offense, but not the greater

offense.

### c.  Felonious Assault

Petitioner's final argument about the jury instructions is that the evidence

supported a charge of felonious assault as a lesser-included offense of assault with

intent to murder.  "The elements of assault with intent to commit murder are: (1) an

assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing

29

murder." *People v. Davis,* 216 Mich. App. 47, 53; 549 N.W.2d 1, 4 (1996) (internal quotation marks omitted). "The elements of felonious assault are (1) an assault, (2) with a dangerous weapon, and (3) with the intent to injure or place the victim in reasonable apprehension of an immediate battery." *Id.*, 216 Mich. App. at 53; 549 N.W.2d at 5. The evidence, as summarized above, demonstrates that the defendants intended to do more than injure or scare the victims. There was evidence from which a jury could have concluded that the defendants possessed an actual intent to kill.

Moreover, the jurors found Petitioner guilty of assault with intent to commit murder even though the trial court also instructed them on the lesser-included offense of assault with intent to do great bodily harm less than murder. The verdict on that count led the Michigan Court of Appeals to conclude that the jury also would have been unwilling to convict Petitioner of felonious assault. The court of appeals therefore found any error to be harmless.

"[A] state court's determination is considered 'unreasonable' in the harmless error context, if it is simply proven that the error had a substantial and injurious effect or influence in determining the jury's verdict and resulted in actual prejudice . . . ." *Barker v. Yukins*, 199 F.3d 867, 876 (6th Cir. 1999). The lack of a jury instruction on felonious assault could not have had a substantial and injurious effect on the jurors' verdict because the jurors rejected a lesser-included offense that was even more serious than felonious assault. Therefore, the state court's conclusion that the error was harmless did not result in a decision that was not contrary to, or an unreasonable application of, *Brecht*.

## 4. Summary

The court concludes for all the reasons given above that the jury instructions did not infect the entire trial to such an extent that the resulting convictions violate due process. Therefore, the state court's adjudication of Petitioner's claims about the jury instructions did not result in a decision that was contrary to, or an unreasonable application of, Supreme Court precedent.

### F. Admission of Seized Weapons

The sixth and final habeas claim alleges that the trial court abused its discretion by admitting in evidence certain weapons seized from the house in Erie, Pennsylvania where Petitioner was arrested. Petitioner contends that there was no indication that the weapons were used during the offense and that the prejudicial effect of the evidence outweighed any probative value it had. The Michigan Court of Appeals disagreed, stating that the probative value of the guns was not outweighed by their prejudicial effect and that the trial court did not abuse its discretion in admitting the guns in evidence.

"Trial court errors in state procedure and/or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment." *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir.) (citing *McGuire*, 502 U.S. at 69-70), *cert. denied*, 543 U.S. 892 (2004). The admission of the weapons confiscated from the house in Erie, Pennsylvania was not fundamentally unfair because there was some basis from which the jurors could conclude that the weapons were the ones used to commit the charged offenses. As explained by the Michigan Court of Appeals,

31

> [t]he prosecution made an offer of proof to show that the guns seized in Pennsylvania were used in the commission of the charged offenses. Outside the presence of the jury, [Eugene] Childrey testified that when they left the van after the shooting, Moore disposed of the rifle, and others dumped one .40 caliber handgun and one .45 caliber handgun near a garbage can. Ten minutes later, in the basement of the Roxbury house, Childrey saw Coffee and Langford with guns, a .40 caliber and a .45 caliber. Childrey saw them again with the guns at Eastland Village. There, Childrey saw Coffee and Langford give their guns to Moore. Childrey testified that these guns he saw were not the same ones that were dumped. At the police station, Childrey was shown the guns that were confiscated in Pennsylvania. He examined them and indicated that those were the guns he saw in the van. At trial, Childrey testified that the guns looked like the ones that Coffee and Langford had in the van.

*Moore*, 2002 WL 869961, at *10.

Furthermore, the defense attorneys were given an opportunity to cross-examine Childrey about the guns. Counsel for D'Andre Coffee elicited testimony that Childrey was not present when the police collected the weapons and he did not know how the police acquired the weapons. (Tr. June 22, 1999, at 158.) In addition, the trial court explained to the jurors that the weapons were merely demonstrative evidence and that it was up to them to decide how much weight to give the evidence. (Tr. June 21, 1999, at 140-41.) Admission of the evidence was not fundamentally unfair.

## IV. CONCLUSION

Petitioner has not shown that the state court's adjudication of his claims on the merits resulted in a decision that was contrary to, or an unreasonable application of, Supreme Court precedent. Therefore, the application for a writ of habeas corpus [Doc. #1, Apr. 1, 2004] is DENIED.

      S/Robert H. Cleland
      ROBERT H. CLELAND
      UNITED STATES DISTRICT JUDGE

32

Dated:  February 7, 2006


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, February 7, 2006, by electronic and/or ordinary mail.

 S/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522


copies mailed to:  Montez Moore, #294893
                           Brad H. Beaver, Assistant Attorney General

S:\Cleland\JUDGE'S DESK\Even Orders\04-71210.Moo.bh.wpd